## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| PATRICIA PECK, | Case No.: 16-cv- |
| Plaintiff, | August 8, 2016 |
| -against- | |
| BANK OF AMERICA, N.A. and BAYVIEW LOAN SERVICING, LLC, | |
| Defendants. | |

## COMPLAINT

Plaintiff Patricia Peck, through her attorney, files this Complaint against Defendants Bank of America, N.A. ("Bank of America") and Bayview Loan Servicing, LLC ("Bayview"), and in support thereof alleges as follows:

## INTRODUCTION

1.      This is an action for damages, costs, and attorney's fees arising out of Bayview's "dual-tracking" of Ms. Peck by attempting to foreclose on her home immediately after its predecessor offered her a loan modification, as well as Bayview's failure to properly "on-board" Ms. Peck's loan data into its system of record. Furthermore, Bank of America was negligent when it failed to transfer to Bayview a complete and accurate servicing file for Ms. Peck's loan. Ms. Peck seeks relief pursuant to the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 et seq. ("RESPA"), the Connecticut Unfair Trade Practices Act, C.G.S. § 42-110a et seq. ("CUTPA"), the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692-1692p, and state common-law.

## JURISDICTION AND VENUE

2.       This Court has jurisdiction under 12 U.S.C. § 2614 and 28 U.S.C. § 1337(a).

3.       This Court also has diversity jurisdiction over the parties pursuant to 28 U.S.C. § 1332 as the parties are citizens of diverse states and the amount in controversy exceeds $75,000.

4.       The Court has supplemental jurisdiction over Ms. Peck's state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the claims over which this Court has original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

5.       Venue in this District is proper as Ms. Peck resides in Windsor, Connecticut, Bank of America and Bayview transact business within the State of Connecticut, and the conduct complained of occurred in this District.

## PARTIES

6.       Ms. Peck is a natural person residing in Windsor, Connecticut.

7.       Ms. Peck is a "natural person" under CUTPA pursuant to C.G.S. § 42-110a (3), an "individual" under Regulation X pursuant to 12 U.S.C. § 2602(5), and a "consumer" under the FDCPA pursuant to 15 U.S.C. § 1692a(3).

8.       Bank of America, a federally chartered national bank association registered to do business in Connecticut, is engaged in the business of servicing residential mortgage loans in Connecticut, with its business address and mailing address located at 100 North Tryon Street, Charlotte, NC 28202 and its legal order and summons processing address located at Legal Order Processing, P.O. Box 15047, Wilmington, DE 19850-5047.

9.       Bayview, a Delaware limited liability company, registered to do business in Connecticut, is engaged in the business of servicing residential mortgage loans in Connecticut,

with its business address and mailing address located at 4425 Ponce de Leon Blvd, 4th Floor,

Coral Gables, FL 33146 and its registered agent for the service of process located at Corporation

Service Company, 50 Weston Street, Hartford, CT 06120-1537.

10.     Ms. Peck's loan is a federally related mortgage loan as defined by 12 U.S.C. §

2602(1) in that such loan is secured by a first lien on a one-family unit of residential real

property and was made by a lender satisfying the requirements of 12 U.S.C. § 2602(1)(B)(i) or a

creditor satisfying the requirements of 12 U.S.C. § 2602(1)(B)(iv).

11.     Bank of America is the former loan servicer of Ms. Peck's loan for the purposes

of 12 U.S.C. § 2605.

12.     Bayview is the loan servicer of Ms. Peck's loan for purposes of 12 U.S.C. § 2605.

## FACTUAL ALLEGATIONS

13.     Ms. Peck owns a single family residential condominium located at 238 High Path

Road in Windsor, Connecticut ("the home").

14.     On May 29, 2007, Ms. Peck obtained a loan secured by a mortgage on the home.

15.     The servicers of the note and mortgage from the beginning of the period relevant

to this Complaint through the present are or were Bank of America and Bayview.

16.      Sometime around September of 2012, Ms. Peck fell behind on her mortgage

payments due to a reduction in her household income.

17.     On August 29, 2013, an action to foreclose on the home was commenced in

Hartford Superior Court.[1]

---

[1] The case was styled *Bank of America, N.A. Successor by Merger to BAC Home Loans Servicing, L.P. F/K/A Countrywide Home Loans Servicing, L.P. v. Peck, Patricia, a/k/a Peck Patricia D. Et Al*, Case No. HHD-CV13-6044792-S. The foreclosing plaintiff was represented by Hunt Leibert Jacobson, P.C. and Ms. Peck proceeded *pro se*.

18.    Bank of America acted as the servicer for Ms. Peck's mortgage loan and was responsible for directing its foreclosure counsel and negotiating with Ms. Peck to resolve her mortgage delinquency and the related foreclosure case.

19.    Bayview acted as the successor servicer for Ms. Peck's mortgage loan and assumed responsibility for directing its foreclosure counsel and negotiating with Ms. Peck to resolve her mortgage delinquency and the foreclosure case.

20.    In or around December of 2014, Ms. Peck submitted an application for a loan modification to Bank of America.[2]

21.    On December 17, 2014, Bank of America moved for a judgment of strict foreclosure.

22.    In a letter dated December 18, 2014, Bank of America acknowledged receipt of Ms. Peck's request for assistance and supporting documentation. In the letter, Bank of America stated that "[w]e received your request regarding a loan modification on the above-referenced loan and forwarded your request to a specialist in the appropriate department. After the necessary information is reviewed, we will respond to your request."[3]

23.    In a letter dated December 19, 2014, Bank of America informed Ms. Peck that it had conducted a valuation of Ms. Peck's property in connection with her loan modification

---

[2] Upon information and belief, this application was Ms. Peck's first complete loan modification application after January 10, 2014, the effective date of the Consumer Financial Protection Bureau's Mortgage Servicing Rule, 12 C.F.R. § 1024 et seq. Ms. Peck reserves her right to amend her complaint to assert a violation of the dual-tracking prohibitions of Regulation X after discovery is completed.

[3] This was the extent of the substantive content of the letter. As set forth infra, under applicable regulations the letter was required to also inform Ms. Peck whether her loan modification application was complete or not.

application. Upon information and belief, Bank of America only obtains valuations if the loan modification application is complete and the file is being underwritten.

24.     On March 9, 2015, Bank of America's motion for a judgment of strict foreclosure against Ms. Peck was granted.

25.     In a letter dated April 1, 2015, Bayview advised Ms. Peck that the owner of the loan had transferred as of March 16, 2015. Upon information and belief, Bayview was not the servicer for the loan at this time.

26.     On March 30, 2015 Ms. Peck moved to open the judgment. Bank of America, rather than consent to Ms. Peck's motion, filed its own motion to open the judgment on April 2, 2015. The judgment was vacated by order on April 20, 2015.

27.     In a letter dated April 8, 2015, Bank of America advised Ms. Peck that she had been "approved to start a Trial Period Plan" commencing May 1, 2015 with monthly payments of $474.03. The letter advised her that she would have to make three to four payments and then Bank of America would modify her loan as long as she remained eligible for a loan modification.

28.     Upon information and belief, Ms. Peck remained eligible for a loan modification in all material respects.

29.     In a letter dated April 10, 2015, Bank of America advised Ms. Peck that servicing of her loan would transfer to Bayview effective May 1, 2015. The letter further stated that

> If you are currently being considered for a loan modification or other foreclosure avoidance program, your new servicer Bayview Loan Servicing, LLC is aware of your current status and will have all of your documents.

30.     On or about May 1, 2015, Ms. Peck spoke to "Sharon," an agent of Bayview. Sharon informed her that any late charges as a result of the loan transfer would be waived and that her payment amount was $474.03.[4]

31.     Ms. Peck tendered four subsequent payments in the amount of $474.03 to Bayview that it accepted and credited to her account on 5/12/2015, 6/11/2015, 7/13/2015, and 8/14/2015.

32.     In a letter dated May 13, 2015, Bayview solicited Ms. Peck for a loan modification application. The letter advised her she needed to submit an entirely new mortgage modification application in order to be considered for a loan modification. The letter further informed Ms. Peck that Bayview could not determine what loss mitigation options she was eligible for until she submitted a new mortgage modification application.

33.     In a letter dated May 15, 2015, Bayview advised Ms. Peck that it was the new servicer for her loan.

34.     On August 20, 2015, despite having accepted four trial period payments and obligating itself to modify Ms. Peck's loan, Bayview moved for a judgment of strict foreclosure.

35.     On September 1, 2015, counsel for Bayview advised Ms. Peck that it was marking the motion for a judgment of strict foreclosure ready.

36.     On September 3, 2015, Bayview filed its foreclosure worksheet, affidavit of debt, and affidavit of attorneys' fees. All of these documents were filed in support of its motion for judgment of strict foreclosure.

---

[4] $474.03 represents the modified payment amount and not the amount that was contractually due under the note and mortgage.

37.     On September 4, 2015, after Ms. Peck protested Bayview's effort to foreclose rather than provide her with a modification, Bayview decided, for the time being, not to seek judgment. However, it did not withdraw its motion and the motion remained on the docket until the action was withdrawn on January 26, 2016.

38.     In a letter dated September 8, 2015, Bayview advised Ms. Peck that it had evidence her hazard insurance had expired. The letter threatened to force-place more expensive hazard insurance if Ms. Peck failed to obtain her own policy. Bayview knew or should have known that the home is a condominium unit. As with other condominium units, hazard insurance is paid through her HOA dues.

39.     For the first time, in a letter dated September 22, 2015, despite previously accepting four trial period payments from Ms. Peck, Bayview finally acknowledged the existence of the trial period modification in writing. Attempting to explain its failure to honor the prior loan modification agreement, Bayview alleged that it had not actually received the loan modification data from Bank of America.

40.     Eight days later, in a letter dated September 30, 2015, Bayview acknowledged that Ms. Peck had successfully completed the trial modification that Bank of America had offered on April 8, 2015. At this time, Bayview provided Ms. Peck with a permanent loan modification offer and Ms. Peck accepted it.

41.     On January 26, 2016 Bayview withdrew the foreclosure action.

42.     Upon information and belief, as a result of the actions and inactions of Bayview, Ms. Peck has been improperly assessed court costs, attorneys' fees, and/or other fees.

43.     As a result of the actions and inactions of Bayview, Ms. Peck suffered and continues to suffer emotional distress.

## FIRST CAUSE OF ACTION

### Bayview's Violations of RESPA and Regulation X

44.     Ms. Peck incorporates by reference the allegations in Paragraphs 1–43 as if fully set forth herein.

45.     The Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") created the Consumer Financial Protection Bureau ("CFPB") and amended the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601, *et seq*. (RESPA). In January of 2013, in accordance with its obligations under Dodd-Frank, the CFPB issued a number of final rules concerning mortgage markets in the United States. Specifically, on January 17, 2013, the CFPB issued the RESPA (Regulation X) Mortgage Servicing Final Rule, 78 F.R. 10695 (February 14, 2013). Regulation X became effective on January 10, 2014.

46.     The CFPB collects complaints submitted by consumers.  It maintains a publicly accessible online database that shows since January 10, 2014, the effective date of Regulation X, the CFPB has received at least three complaints against Bayview for dual-tracking issues, among over 180 complaints for mortgage-related issues.  See also Nunez v. J.P. Morgan Chase Bank, N.A., unpublished *per curiam* opinion in case no.: 15-12188 (11th Cir. Apr. 22, 2016) (discussing documented issues with Bayview "on-boarding" in-process loan modifications during servicing transfers).

47.     With respect to Ms. Peck, Bayview violated RESPA and Regulation X in the following ways:

   a) by moving for a foreclosure judgment after Ms. Peck submitted a complete loss mitigation application, in violation of 12 C.F.R. § 1024.41(g); and

   b) by moving for a foreclosure judgment while Ms. Peck was performing under an agreement on a loss mitigation option, in violation of 12 C.F.R. §

1024.41(g).

48.     Upon information and belief, Bayview has engaged in a pattern or practice of noncompliance with 12 C.F.R. § 1024.41(g) and 12 U.S.C. § 2605(e) with respect to Ms. Peck as well as other mortgage servicing customers.

49.     As a direct, proximate, and foreseeable result of the foregoing acts and omissions, Ms. Peck has suffered actual damages, including court costs, the costs of postage, and, upon information and belief, foreclosure-related costs and fees improperly assessed to her mortgage account.

50.     As a result of the above violations, Bayview is liable to Ms. Peck for actual and consequential damages, including emotional damages, statutory damages of $2,000 per violation pursuant to 12 U.S.C. § 2605(f)(1)(B), costs, and attorneys' fees.

## SECOND CAUSE OF ACTION

### Bayview's Violation of CUTPA

51.     Ms. Peck incorporates by reference the allegations in Paragraphs 1-43 and 46-47 as if fully set forth herein.

52.     Bayview's actions described herein were willful, wanton, and/or reckless and indicate a reckless disregard for the just rights or safety of others and/or the consequences of its actions.

53.     The actions of Bayview were undertaken in the conduct of trade or commerce.

54.     Bayview has engaged in unfair and/or deceptive acts or practices within the meaning of C.G.S. § 42-110b(a) including, but not limited to:

   a)   "Dual-tracking" Ms. Peck by moving for a foreclosure judgment after Ms. Peck submitted a complete loss mitigation application;

b)  Assessing to Ms. Peck's mortgage account costs and fees incurred as a result of its violations of 12 C.F.R. § 1024.41(g); and

c)  Failing to comply with its obligations as transferee servicer under 12 CFR 1024.38(b)(4)(ii) to "identify necessary documents or information that may not have been transferred by a transferor servicer and obtain such documents from the transferor servicer."

55.     Bayview's actions have offended public policy, including those set forth in the mortgage servicing rules found in Regulation X.[5]

56.     Bayview's actions are willful, immoral, unscrupulous, unethical, and/or oppressive, and cause substantial injury to customers such as Ms. Peck.

57.     As a direct, proximate, and foreseeable result of the foregoing acts and omissions, Ms. Peck has suffered an "ascertainable loss" as that term is used in C.G.S. § 42-110g(a), including but not limited to court costs, the costs of postage, and, upon information and belief, foreclosure-related costs and fees improperly assessed to their mortgage account.

---

[5] See Preamble to Regulation X, 48-49, *available at* http://files.consumerfinance.gov/f/201301_cfpb_final-rule_servicing-respa-preamble.pdf (last accessed August 5, 2016 at 12:26 p.m.).

RESPA is a remedial consumer protection statute and imposes obligations upon servicers of federally related mortgage loans. RESPA has established a consumer protection paradigm of requiring disclosures to consumers, and establishing servicer requirements and prohibitions, for the purpose of protecting borrowers from certain potential harms. …Servicers are subject to civil liability for failure to comply with such requirements and prohibitions.

Considered as a whole, RESPA, as amended by the Dodd-Frank Act, reflects at least two significant consumer protection purposes: (1) to establish requirements that ensure that servicers have a reasonable basis for undertaking actions that may harm borrowers and (2) *to establish servicers' duties to borrowers with respect to the servicing of federally related mortgage loans*.

(emphasis added).

58.     As a result of its violation of CUTPA, Bayview is liable to Ms. Peck for actual and consequential damages, including emotional damages, costs, and attorney's fees pursuant to C.G.S. § 42-110g(d).

59.     A copy of this pleading has been electronically mailed to the Attorney General and the Commissioner of Consumer Protection pursuant to C.G.S. § 42-110g(c).

## THIRD CAUSE OF ACTION

### Bank of America's Violation of CUTPA

60.     Ms. Peck incorporates by reference the allegations in Paragraphs 1-43 as if fully set forth herein.

61.     Bank of America's actions described herein were willful, wanton, and/or reckless and indicate a reckless disregard for the just rights or safety of others and/or the consequences of its actions.

62.     Bank of America has a history of systemically failing to transfer complete servicing files.

63.     On April 13, 2011, the Office of the Comptroller of the Currency ("OCC"), Bank of America's principal banking regulator, entered into a consent agreement with respect to Bank of America's foreclosure, default servicing, and loss mitigation practices ("Consent Order"). Among other things, the Consent Order required Bank of America to establish policies, procedures, and controls to ensure that, among other requirements, "staff are trained specifically in handling mortgage delinquencies, Loss Mitigation, and loan modifications."

64.     Bank of America repeatedly failed to comply with the requirements of the Consent Order in relation to Ms. Peck's loan by failing to transfer a complete and accurate copy

of the servicing file and failing to complete Ms. Peck's loan modification before transferring the servicing file.

65.     On April 4, 2012, Bank of America entered into a consent judgment known as the "National Mortgage Settlement." One component of the consent judgment that Bank of America entered into with the United States and 49 states' attorney generals in 2012 related to errors in the transfer of servicing files. Specifically, the release provided to Bank of America by the United States stated that:

> The United States contends that it has certain civil claims against … [Bank of America for] …"[d]eficiencies in foreclosing on single-family residential mortgage loans or acquiring title in lieu of foreclosure, including the … transfer of … servicing rights or obligations, the charging of any fees … and dual-tracking foreclosure and loan modification activities, and communications with borrowers in respect of foreclosure….

Exhibit F, Federal Release, Consent Judgment, United States et al. v. Bank of America Corp. et al., case no.: 12-cv-00361-RMC (D. D.C. Apr. 4, 2012).

66.     As a result of the Consent Judgment, Bank of America agreed that:

> a. At time of transfer or sale, Servicer shall inform successor servicer (including a subservicer) whether a loan modification is pending.

> b. Any contract for the transfer or sale of servicing rights shall obligate the successor servicer to accept and continue processing pending loan modification requests.

> c. Any contract for the transfer or sale of servicing rights shall obligate the successor servicer to honor trial and permanent loan modification agreements entered into by prior servicer.

> d. Any contract for transfer or sale of servicing rights shall designate that borrowers are third party beneficiaries under paragraphs IV.M.1.b and IV.M.1.c, above.

Exhibit A, Settlement Terms, Section II(M) Consent Judgment, United States et al. v. Bank of America Corp. et al., case no.: 12-cv-00361-RMC (D. D.C. Apr. 4, 2012). The Consent Judgment remained in effect until September 4, 2015.

67.     Despite the consent judgment, of the over 1800 mortgage servicing complaints filed against Bank of America with the CFPB after January 1, 2013, at least 90 complained of errors by Bank of America in the transfer of servicing files. Upon information and belief, many of the complaints filed with the CFPB against Bank of America involved similar failures to properly transfer in-process loan modification agreements.

68.     Upon information and belief, with respect to Ms. Peck, Bank of America failed to inform Bayview that a loan modification was pending. The contract for the transfer failed to require that Bayview to accept and complete the processing of Ms. Peck's loan modification, honor the prior trial period payment, or designate that Ms. Peck was a third-party beneficiary under the contract.

69.     The actions of Bank of America were undertaken in the conduct of trade or commerce.

70.     Bank of America has engaged in unfair and/or deceptive acts or practices within the meaning of C.G.S. § 42-110b(a) including, but not limited to failing to comply with its obligations as transferor servicer under 12 CFR 1024.38(b)(4)(i) to

> [T]imely transfer all information and documents in the possession or control of the servicer relating to a transferred mortgage loan to a transferee servicer in a form and manner that ensures the accuracy of the information and documents transferred and that enables a transferee servicer to comply with the terms of the transferee servicer's obligations to the owner or assignee of the mortgage loan and applicable law.

71.     Bank of America's actions have offended public policy, including that set forth in RESPA, the mortgage servicing rules found in federal "Regulation X," as issued by the Consumer Financial Protection Bureau, and the National Mortgage Settlement.

72.     Bank of America's actions are willful, immoral, unscrupulous, unethical, and/or oppressive, and cause substantial injury to customers such as Ms. Peck.

73.     As a direct, proximate, and foreseeable result of the foregoing acts and omissions, Ms. Peck has suffered an "ascertainable loss" as that term is used in C.G.S. § 42-110g(a), including but not limited to court costs, the costs of postage, and, upon information and belief, foreclosure-related costs and fees improperly assessed to their mortgage account.

74.     As a result of its violation of CUTPA, Bank of America is liable to Ms. Peck for actual and consequential damages, costs, and attorney's fees pursuant to C.G.S. § 42-110g(d).

## FOURTH CAUSE OF ACTION

### Bayview's negligence

75.     Ms. Peck incorporates by reference the allegations in Paragraphs 1-59 as if fully set forth herein.

76.     Bayview owes a duty of care to the customers whose loans its services, including Ms. Peck.  Such a duty arises, in part, out of Regulation X, 12 C.F.R. § 1024 et seq. The purpose of Regulation X is, in part, to establish servicer's duties with regards to federally related mortgage loans. See, e.g., Preamble to Regulation X, 48-49.[6] Regulation X is part of a comprehensive framework of statutes, regulations, and consent agreements, including the 2011

---

[6] A*vailable at* http://files.consumerfinance.gov/f/201301_cfpb_final_rule_servicing-respa-preamble.pdf (last accessed August 5, 2016 at 12:26 p.m.).

OCC consent order with Bank of America and the 2012 National Mortgage Settlement, that establish an industry-wide standard of care for the servicing of mortgage loans.

77.     Bank of America has a statutory and/or regulatory duty to Ms. Peck to perform servicing transfers in compliance with RESPA and Regulation X.

78.     Ms. Peck, as a borrower of a federally-related residential mortgage, is within the class of persons that RESPA and Regulation X were intended to protect.

79.     Bayview has a general duty to maintain documents and data related to a borrower's mortgage loan in a manner that enables it to compile a single servicing file within five days. 12 CFR 1024.38(c)(2). However, it took Bayview 144 days to even acknowledge that it had failed to properly maintain its servicing file and request the missing information from Bank of America.

80.     Under the official CFPB interpretation, "a transferee servicer must have policies and procedures reasonably designed to ensure, in connection with a servicing transfer, that the transferee servicer receives information regarding any loss mitigation discussions with a borrower, including any copies of loss mitigation agreements." CFPB Official Interpretation, 12 CFR 1024.38(b)(4)(ii). The CFPB provides a specific example for a scenario like Ms. Peck's. Id. Where the transferee servicer receives information from the transferor servicer that a loan modification is in process, the transferee is required to obtain the information about the loan modification before requesting any information from the borrower. Id. However, Bayview solicited Ms. Peck for a modification before it determined or attempted to determine whether one was already in progress.

81.     Bayview knew or should have known that "dual-tracking" Ms. Peck by improperly proceeding with foreclosure during the loss mitigation process would cause her harm.

82.     Bayview knew or should have known that failing to promptly request information from Bank of America could cause Ms. Peck harm. Specifically, in a phone call on May 1, 2015 a representative of Bayview acknowledged that Ms. Peck's monthly payment amount had been modified to $474.03. However, Bayview did not formally acknowledge existence of the trial modification plan or indicate that it needed additional information from Bank of America until September 22, 2015.

83.     Bayview breached its duty of care by moving for a foreclosure judgment against Ms. Peck and for failing to promptly request missing information from the transferor servicer Bank of America despite its actual knowledge of the missing information as of the effective date of the transfer, which caused injury to Ms. Peck.

84.     As a direct and foreseeable result of Bayview's negligence, breach of its duty of care, and violations of Regulation X and RESPA, Ms. Peck has suffered damages, including but not limited to the imposition of additional costs and fees, expenses incurred in connection with Bayview's efforts to obtain a foreclosure judgment, and emotional distress.

85.     Bayview is liable for the damages suffered by Ms. Peck as a result of its negligent acts and omissions.

## FIFTH CAUSE OF ACTION

### Bank of America's Negligence

86.     Ms. Peck incorporates by reference the allegations in Paragraphs 1-43 and 60-74 as if fully set forth herein.

87.     Bank of America owes a duty of care to the customers whose loans its services, including Ms. Peck.  Such a duty arises, in part, out of Regulation X, 12 C.F.R. § 1024 et seq. The purpose of Regulation X is, in part, to establish servicer's duties with regards to federally

related mortgage loans. See, e.g., Preamble to Regulation X, 48-49.[7] Regulation X is part of a comprehensive framework of statutes, regulations, and consent agreements, the 2011 OCC consent order with Bank of America, and the 2012 National Mortgage Settlement that establish an industry-wide standard of care for the servicing of mortgage loans.

88.     Bank of America has a statutory and/or regulatory duty to Ms. Peck to perform servicing transfers in compliance with RESPA and Regulation X.

89.     Ms. Peck, as a borrower of a federally-related residential mortgage, is within the class of persons that RESPA and Regulation X were intended to protect.

90.     Specifically, Bank of America must "timely transfer all information and documents" to new servicers "in a form and manner that ensures the accuracy of the information and documents transferred." 12 CFR 1024.38(b)(4)(i).

91.     The official CFPB interpretation of the provisions governing transfer of servicing files specifically state that

> A transferor servicer's policies and procedures must be reasonably designed to ensure that the transfer includes any information reflecting the current status of discussions with a borrower regarding loss mitigation options, any agreements entered into with a borrower on a loss mitigation option, and any analysis by a servicer with respect to potential recovery from a non-performing mortgage loan, as appropriate.

CFPB Official Interpretation, 12 CFR 1024.38(b)(4)(i).

92.     Bank of America has a general duty to maintain documents and data related to a borrower's mortgage loan in a manner that enables it to compile a single servicing file within five days. 12 CFR 1024.38(c)(2).

---

[7] A*vailable at* http://files.consumerfinance.gov/f/201301_cfpb_final-rule_servicing-respa-preamble.pdf (last accessed August 5, 2016 at 12:26 p.m.).

93.     Upon information and belief, Bank of America failed to timely and accurately transfer all information to Bayview when it transferred the servicing rights to the underlying loan.

94.     Bank of America knew or should have known that the failure to properly transfer the servicing file would cause Ms. Peck harm.

95.     Bank of America also undertook a duty of care with regards to Ms. Peck's modification application because it reasonably knew that Ms. Peck would be harmed if it treated her application negligently. Bank of America took an active role in Ms. Peck's financial affairs by (1) soliciting her for a loan modification, (2) accepting personal financial information and documentation from her in support of a loan modification and (3) offering her a trial period mortgage modification. As a result, it assumed a duty to engage in loss mitigation servicing with respect to the modification in a non-negligent manner.

96.     Bank of America breached its duty of care by failing to accurately transfer the servicing file to Bank of America, which caused injury to Ms. Peck.

97.     As a direct and foreseeable result of Bank of America's negligence, breach of its duty of care, and violations of RESPA and Regulation X, Ms. Peck has suffered damages, including but not limited to the imposition of additional costs and fees, expenses incurred in connection with Bayview's efforts to obtain a foreclosure judgment, and emotional distress.

98.     Bank of America is liable for the damages suffered by Ms. Peck as a result of its negligent acts and omissions.

## SIXTH CAUSE OF ACTION

### Bayview's Violations of the FDCPA

99.     Ms. Peck incorporates by reference the allegations in Paragraphs 1-59 and 75-85 as if fully set forth herein.

100.    The Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692-1692p, prohibits the use of deceptive, misleading, or harassing attempts to collect a debt.

101.    The term "consumer" as defined in 15 U.S.C. § 1692a(3) means "any natural person obligated or allegedly obligated to pay any debt."

102.    The term "debt" as defined in 15 U.S.C. § 1692a(5) means "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance or services which are the subject of the transaction are primarily for personal, family or household purposes, whether or not such obligation has been reduced to judgment."

103.    The term "debt collector" as defined in 15 U.S.C. § 1692a(6) includes any person who "regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." It does not include a person collecting debts that were not in default at the time that the person obtained them. 15 U.S.C. § 1692a(6)(F)(iii).

104.    Bayview was a "debt collector" within the meaning of 15 U.S.C. § 1692a(6) at the time it took over servicing of Ms. Peck's account as the account was in default at the time of transfer, and Ms. Peck had yet to make payments necessary to bring her account current..

105.    15 U.S.C. § 1692e prohibits debt collectors from using any false, deceptive, or misleading representation or means in connection with the collection of any debt. Section 1692e (2)(a) specifically prohibits the false representation of the character, amount, or legal status of any debt. Section 1692e (10) prohibits debt collectors from using any false representation or

deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

106.    In several instances in connection with the collection of Ms. Peck's loan, Bayview, directly or indirectly, has made false representations about the character, amount, or legal status of a debt, including but not limited to false statements:

      a.    About its intent to force-place insurance that it knew or should have known that insurance was paid for through Ms. Peck's homeowner's association dues;

      b.    About Ms. Peck's loan terms, when it acquired her loan with an in-process modification;

107.    The acts and practices alleged in Paragraph 106 constitute violations of 15 U.S.C. § 1692e. As a result of the foregoing, Bayview is liable to Ms. Peck for actual and consequential damages, including emotional damages, statutory damages, reasonable attorneys' fees, and costs pursuant to 15 U.S.C. § 1692l.

108.    15 U.S.C. § 1692f prohibits debt collectors from using any unfair or unconscionable means to collect or attempt to collect any debt.

109.    Bayview subsequently collected or attempted to collect amounts that were not authorized by the company's contracts with consumers or permitted by law, including its attempt to collect fees and charges for force-placed insurance and its actual collection of additional servicer advances that it incurred by failing to honor the terms of a previously offered loan modification.

110.    The acts and practices alleged in Paragraph 109 constitute violations of 15 U.S.C. § 1692f. As a result of the foregoing, Bayview is liable to Ms. Peck for actual and consequential damages, including emotional damages, statutory damages, reasonable attorneys' fees, and costs pursuant to 15 U.S.C. § 1692l.

111.    15 U.S.C. § 1692f(11) requires that any debt collector provide notice in its initial communication that it is a debt collector. 15 U.S.C. § 1692h(a) requires that debt collectors provide consumers with a mini-miranda warning either in the initial communication or within five business days of the initial communication.

112.    Bayview's April 1, 2015 letter advising Ms. Peck that the ownership of her mortgage had been transferred was its initial communication with Ms. Peck. The April 1, 2015 letter does not indicate that Bayview is a debt collector. The April 1, 2015 letter did not contain the mini-miranda warning required by the FDCPA.

113.    Upon information and belief, Ms. Peck received no other correspondence from Bayview until its May 13, 2015 loss mitigation solicitation.

114.    The acts and practices alleged in Paragraphs 112 and 113 constitute violations of 15 U.S.C. §§ 1692e and 1692g.

115.    As a result of the foregoing, Bayview is liable to Ms. Peck for actual and consequential damages, including emotional damages, statutory damages, reasonable attorneys' fees, and costs pursuant to 15 U.S.C. § 1692l.

**RELIEF**

The Plaintiff respectfully requests that judgment be entered against the Defendants for the following:

(1) Statutory damages pursuant to 12 U.S.C. § 2605(f)(1)(B) and 15 U.S.C. 1692l;

(2) Actual and consequential damages;

(3) Punitive damages in an amount calculated to punish Bank of America and Bayview for their willful and egregious conduct, pursuant to C.G.S. § 42-110g(a);

(4) Costs and reasonable attorney's fees pursuant to 12 U.S.C. § 2605(f)(1)(C), C.G.S. § 42-150bb, C.G.S. § 42-110g(d); and 15 U.S.C. 1692l; and

(5) For such other and further relief as the Court deems just and proper.


THE PLAINTIFF,
PATRICIA PECK


By Counsel: /s/ David Lavery
                    David Lavery (ct29971)
                    Jeffrey Gentes (ct28561)
                    Connecticut Fair Housing Center
                    221 Main Street, 4th Floor
                    Hartford, CT  06106
                    (860) 560-8948
                    (860) 247-4236 fax
                    dlavery@ctfairhousing.org